UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| ALISA JOHNSON, LAURA DAY, KOREY THOMAS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ACTIVEHOURS, INC. d/b/a EARNIN,<br><br>Defendant. | No.<br><br>**CLASS ACTION** |

## CLASS ACTION COMPLAINT

Alisa Johnson, Laura Day, and Korey Thomas ("Plaintiffs"), individually and on behalf of the class defined below, bring this action against Activehours, Inc. ("Defendant" or "EarnIn"), and allege as follows:

## NATURE OF THE ACTION

1. This action concerns cash advance products that Defendant offers in Maryland.

2. Defendant charges fees to obtain compensation for offering its products, and those fees, on average, yield APRs of 284%. *See Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, Center for Responsible Lending, p. 10 (Apr. 2024), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf.

3. These types of excessive fees make it difficult for consumers to pay bills, increase the likelihood that they will overdraft a bank account, and make it harder for consumers to become financially stable. *See id.*, pp. 6-7, 12-13.

4. This is exactly why Maryland law outlaws Defendant's products, and why federal law requires Defendant to truthfully disclose the cost of its products.

1

5. Plaintiffs bring this action, on behalf themselves and the class defined below, under the Maryland Consumer Loan Law ("CLL"), Maryland Consumer Protection Act ("CPA"), and Truth in Lending Act ("TILA"), and seek to recover all payments made to EarnIn on any advance or loan on which a tip or fee was paid.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d).

7. The Court has personal jurisdiction because Plaintiffs' claims arose in this this district.

8. Venue is proper under 28 U.S.C. § 1391.

## PARTIES

9. Alisa Johnson is a person residing in Baltimore County, Maryland.

10. Laura Day is a person residing in Kent County, Delaware.

11. Korey Thomas is a person residing in Baltimore County, Maryland.

12. EarnIn is a technology company headquartered in Palo Alto, California.

13. EarnIn is not a bank and is not licensed under any Maryland statute.

14. EarnIn offers a cash advance product to Maryland consumers over the internet.

15. Investors have paid EarnIn hundreds of millions of dollars in hopes that EarnIn can evade state law in offering the product. *See* Kate Clark, *Earnin raises $125M to help workers track and cash out wages in real time*, TechCrunch (Dec. 20, 2018), https://techcrunch.com/2018/12/20/earnin-raises-125m-to-help-workers-track-and-cash-out-wages-in-real-time/.

16. These investors expect "to be paid back royally" for their investment. Tara Siegel Bernard, *Apps Will Get You Paid Early, for a Price*, N.Y. Times (Oct. 2, 2020), https://www.nytimes.com/2020/10/02/your-money/cash-advance-apps-paychecks.html/.

## FACTUAL ALLEGATIONS

*EarnIn Offers Cash Advance Products To Consumers*

17. EarnIn operates a lending app called "EarnIn."

18. The app provides cash advances to consumers.

19. EarnIn advertises this product as a way for people to access wages before payday.

20. EarnIn allows users to receive up to $100 of advances each day, and up to $750 per pay period.

21. EarnIn currently offers a standard advance and an expedited advance.

22. The standard advance is deposited into a bank account within a few days, while the expedited advance is deposited within a few minutes.

23. Users cannot obtain an expedited advance without paying a "lightning speed fee," which ranges from $1.99 to $3.99.[1]

24. This fee is intended to compensate EarnIn for lending money; it does not cover the cost of providing other services.

25. Additionally, before users can obtain an advance, they must proceed past a screen that has selected a default "tip."

26. Users must change the default amount to zero to avoid paying a tip.

27. EarnIn represents that tips "pay it forward," "help" people, "support the service," and "keep EarnIn running for the rest of the community."

28. EarnIn also represents that a larger tip will help more people.[2]

---

[1] It costs: $1.99 for an advance of up to $24.99; $2.99 for an advance of $25.00-$74.99; and $3.99 for an advance of $75.00 or more. Because EarnIn only allows its users to take out up to $100.00 in cash advances each day, users may incur multiple lightning speed fees in a single pay period.

[2] EarnIn represents that: a $6.00 tip will help 1 person; an $8.50 tip will help two people; and an $11.00 tip will help three people.

29. Contrary to these claims, tips do not go to, for example, delivery drivers or workers that are trying to make ends meet.

30. Instead, tips serve as a profit center for EarnIn—a highly capitalized company backed by venture capitalists and experienced institutional investors—and are solely intended to compensate EarnIn for lending money.

*EarnIn Requires Consumers To Agree To Repay Its Cash Advances*

31. EarnIn requires its advances to be repaid on a consumer's next payday.

32. EarnIn communicates this through its app and advertisements: the app states that advances are "[d]ue to EarnIn on payday;" while the advertisements state that advances are due "when your paycheck hits."

33. To ensure it gets repaid, EarnIn requires its users to: (i) have an employer that pays them regularly; (ii) link their bank account to which paychecks are deposited to EarnIn's app; and (iii) authorize EarnIn to automatically debit the linked bank accounts on payday in an amount that is equal to the advance a user receives and the tips and fees a user agrees to repay.

34. Users cannot obtain advances without verifying their employment, without linking the bank account into which their paychecks are deposited to EarnIn's app, and without allowing EarnIn to automatically debit the linked accounts on payday.

35. Moreover, before issuing advances, EarnIn performs a proprietary credit check on a user's linked bank account to ensure that the account will have sufficient funds to repay EarnIn's automatic account debits on payday.

36. EarnIn will not issue cash advances unless it believes it will be able to automatically deduct its cash advances, with any tips or fees, from a consumer's bank account immediately after their employer deposits a paycheck on payday.

37. EarnIn's underwriting criteria, the requirement that users link their bank accounts to the EarnIn app, and the requirement that users authorize EarnIn to deduct its advances, tips, and fees from bank accounts on payday, has resulted in EarnIn obtaining repayment on virtually every cash advance that EarnIn issues. See *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Financial Health Network, pp. 2, 20 (Apr. 2021), https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf (studying EarnIn and other cash advance apps, and finding that these apps were able to obtain repayment at least 97% of the time).

***EarnIn's Cash Advances Are Costly And Illegal***

38. The "tips" and "fees" charged, collected, contracted for, and received in connection with EarnIn's cash advance product yield triple-digit APRs. *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, Center for Responsible Lending, pp. 5, 10 (Apr. 2024), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf (analyzing 19,561 advances issued through EarnIn's app, and finding that the average APR was 284%).[3]

39. These APRs far exceed what is allowed by Maryland law, which caps small dollar loan APRs at 33%. Md. Com. Law § 12-306(a)(2)(i).

40. Moreover, Maryland law prohibits EarnIn from receiving or retaining any amount on any advance, including principal and fees, because EarnIn is not licensed to make or issue loans in Maryland. Md. Com. Law § 12-314(b)(1)(i)(3), (b)(2).

---

[3] Take for example a $25.00 and a $75.00 advance, each with a two-week repayment schedule: a $2.99 "lightning speed fee" yields a 311.81% APR on the $25.00 advance, and a $3.99 "lightning speed fee" yields a 138.70% APR on the $75.00 advance; a 10% "tip" yields a 260.71% APR on both advances; and when the fees and tips are combined, they yield a 572.52% APR on the $25.00 advance, and a 399.41% APR on the $75.00 advance.

*EarnIn's Cash Advances Harm Consumers*

41. The high cost associated with EarnIn's cash advances leaves holes in the paychecks of borrowers, which leads to a cycle of reborrowing, where consumers take out new cash advances to fill the gaps created by old advances. *See, e.g.*, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, Center for Responsible Lending, p. 13 (Apr. 2024), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf (detailing user of EarnIn app trapped in cycle of reborrowing, who stated "[i]t doesn't help having to forfeit half or more of my check every payday and then borrow it back"); Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (June 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advance-apps-like-earnin-dailypay; (detailing user of Earnin app who "found himself trapped in a constant loop of borrowing" and felt he had "completely lost control of the situation, with no way to work it out"); Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (detailing user of Earnin app who described app as a "vicious cycle" and who "had no money" after paying tips and fees); Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/online-banking-lending-earnin-tip/603304/ (detailing Earnin user who fell into "cycle of get paid and borrow, get paid and borrow").

42. This cycle of reborrowing erodes the paychecks of borrowers, which prevents them from saving money for their families, and prevents the financially vulnerable from improving their situation and moving out of debt.

43. This cycle of reborrowing also makes it more likely that consumers will be subject to additional charges or fees, like bank overdraft fees, which further erodes the financial stability of EarnIn's user base.

44. Indeed, a recent study found that users of EarnIn's app, and other similar apps, were more likely to have a bank account overdrafted after obtaining cash advances. *See, e.g.*, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, Center for Responsible Lending, pp. 6-7 (Apr. 2024), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf.

45. To make matters worse, EarnIn never discloses the cost of its cash advance product, despite federal law requiring EarnIn to disclose the cost of its tips and fees in terms of an "annual percentage rate." *See* 15 U.S.C. § 1638(a)(4).[4]

46. This results in users failing to understand the actual cost of EarnIn's cash advance product. *See, e.g.*, Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (detailing user that was unaware of the cost of EarnIn's cash advance product); Laurence Darmiento, *His app lends money for free. But it will probably cost you*, LA Times (May 18, 2022), https://www.latimes.com/business/story/2022-05-18/dave-inc-jason-wilk-cash-advance-app (similar for other cash advance app).

47. It also incentivizes EarnIn's user base to become dependent on EarnIn's cash advance product on the false belief that EarnIn's product has no cost, when EarnIn's product is actually one of the most expensive forms of credit.

---

[4] The Consumer Financial Protection Bureau ("CFPB") recently agreed EarnIn must disclose this information. *See* Notice, No. CFPB-2024-0032, https://files.consumerfinance.gov/f/documents/cfpb_paycheck-advance-marketplace_proposed-interpretive-rule_2024-07.pdf.

48. At base, EarnIn's cash advance product is no different than, and just expensive as, a payday loan. *See Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, Center for Responsible Lending, pp. 10-12 (Apr. 2024), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf (analyzing EarnIn's app and four similar cash advance apps, and finding that APRs for these products were "nearly as much as the APR on a typical payday loan"); *Initial Statement of Reasons for the Proposed Adoption of Regulations*, California Department of Financial Protection and Innovation, p. 62 (Mar. 15, 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2 (stating "APRs for companies [offering cash advances via apps] are generally similar to the average APRs for licensed payday lenders in California"); Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (June 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advance-apps-like-earnin-dailypay (displaying cost of payday loans versus cash advances); Grace Gedye, *The new payday loans? California moves to regulate cash advance apps*, Cal Matters (June 5, 2023), https://calmatters.org/economy/2023/06/earned-wage-access/ (similar).

49. In fact, EarnIn's cash advance product is worse than a payday loan because EarnIn obtains payment on its cash advance product at a rate that "significantly exceeds" that of a payday lender. *Initial Statement of Reasons for the Proposed Adoption of Regulations*, California Department of Financial Protection and Innovation, p. 62 (Mar. 15, 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2.

50. In other words, EarnIn's users are far more likely to have costs that yield triple digit APRs deducted from their accounts than users of traditional payday lenders, which means EarnIn's

users are far more likely to have their paychecks eroded, and be unable to improve their financial situation, than users of traditional payday lenders.

51. These harms are exactly why Maryland law caps the APRs for small loans at 33%, and why Maryland law makes EarnIn's cash advance product unlawful.

*Facts Relevant to Plaintiffs*

52. Plaintiffs signed up for EarnIn's app, and obtained and repaid cash advances from EarnIn, while they resided in Maryland.

53. Plaintiffs used those advances for personal, family, and/or household purposes.

54. Plaintiffs paid EarnIn's fees and tips.

55. Plaintiffs did not know they were paying interest by paying these charges.

56. EarnIn's fees and tips yielded triple-digit APRs.

57. Plaintiffs were unaware that the amounts they paid yielded triple-digit APRs.

58. For example: one of the last cash advances Johnson obtained was for $100.00, was to be repaid in two weeks or less, and included an $11.00 tip and a $3.99 express fee, which yielded an APR of at least 390%; one of the last cash advances Thomas obtained was for $100.00, was to be repaid in two weeks or less, and included a $3.00 tip and a $3.99 express fee, which yielded an APR of at least 180%; and one of the last advances Day obtained was for $100.00, and included a $3.99 express fee, which yielded an APR of at least 104%.

59. EarnIn failed to disclose that the amounts Plaintiffs paid yielded triple-digit APRs.

## CLASS ACTION ALLEGATIONS

60. Plaintiffs bring this action individually and on behalf of all others similarly situated under Fed. R. Civ. P. 23.

61. Plaintiffs seek to certify the following class: "All persons that obtained an advance or loan from Defendant, and resided in Maryland when they signed up for the EarnIn app, or resided in Maryland when they obtained an advance or loan from Defendant."

62. <u>Fed. R. Civ. P. 23(a)(1):</u> On information and belief, there are tens of thousands of class members, making joinder of those persons impracticable. Additionally, the members of the class are identifiable through Defendant's records, Defendant's third-party service providers, and the banks through which the class members hold accounts.

63. <u>Fed. R. Civ. P. 23(a)(2), 23(b)(3):</u> Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to whether Defendant's advances qualify as "loans" or "credit" under the relevant laws and whether the "tips" or "fees" that Defendant charged or that Plaintiffs paid qualify as "interest," "finance charges," or other amounts under the laws at issue. These common questions, and other common questions of law and fact, will predominate over individual questions, to the extent any individual questions exist.

64. <u>Fed. R. Civ. P. 23(a)(3):</u> Plaintiffs' claims are typical of the claims of the members of the class because the claims of Plaintiffs and the class are based on the same legal theories and arise from the same conduct.

65. <u>Fed. R. Civ. P. 23(a)(4):</u> Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and has no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

66. <u>Fed. R. Civ. P. 23(b)(3)</u>: Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the class may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class members. Additionally, requiring Plaintiffs and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

## COUNT I
### Violation of the Consumer Loan Law
### Md. Com. Law §§ 12-301, *et seq.*

67. This claim is brought individually and on behalf of the class.

68. The CLL applies to loans of $25,000 or less that are made for personal, family, or household purposes. Md. Com. Law § 12-303(a)(1).

69. The advances at issue in this case are loans. *Id.* § 12-301(e)(1).

70. Defendant is not licensed under the CLL.

71. Defendant is not exempt from the CLL's licensing requirement.

72. The CLL prohibits a person from engaging in the business of making loans unless the person is licensed or exempt from the licensing requirement. *Id.* § 12-302.

73. If a person makes a loan under the CLL without a license, the loan is unenforceable and void. *Id.* § 12-314(b)(1)(i)(3).

74. An unlicensed person may not receive or retain any principal, interest, fees, or other compensation with respect to a loan that is void or unenforceable pursuant to the CLL. *Id.* § 12-314(b)(2).

75. Because Defendant made loans without a license, those loans are unenforceable and void, and Defendant may not retain any principle, interest, fees, or other compensation Defendant collected or received, and must return those amounts to Plaintiffs and the class.

76. Accordingly, for all loans that Defendant made, and on which Defendant charged, collected, contracted for, or received any tips, fees, or other amounts, Defendant must return all of the principal, tips, fees, and other amounts that Defendant received over the past twelve years. *See Price v. Murdy*, 198 A.3d 798 (Md. App. 2018) (holding that twelve-year statute of limitations applies to CLL).

### COUNT II
### Violation of the Consumer Protection Act
### Md. Com. Law §§ 13-101, *et seq.*

77. This claim is brought individually and on behalf of the class.

78. Defendant's conduct as described herein constitutes "unfair, abusive, or deceptive trade practices" under the CPA. Md. Com. Law § 13-301.

79. That conduct occurred in the conduct of extending consumer credit and collecting consumer debt, as prohibited by the CPA. *Id.* § 13-303.

80. Defendant engaged in *unfair* and *deceptive* practices by: branding its advances as a no-cost, no-fee product, even though the product included interest that yielded triple-digit APRs; and knowingly concealing and suppressing, and consciously omitting material facts from Plaintiffs and the class members in recognition that consumers would rely on Defendant's uniform representations about its financial product.

81. The acts and omissions resulted in a substantial injury that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces and is not the type of injury that a consumer could reasonably have avoided.

82. Defendant engaged in *abusive* practices by: obscuring important characteristics of its financial product; and leveraging circumstances—including gaps in understanding, unequal bargaining power, and consumer reliance—to gain unreasonable advantage and cause injury.

83. Defendant's acts and omissions possessed the tendency or capacity to mislead or create the likelihood of deception.

84. As described herein, Plaintiffs sustained injury or loss as a proximate result of Defendant's conduct.

85. As a direct and proximate result of these practices, Plaintiffs and the members of the class have been damaged, and are entitled to recover actual damages to the extent permitted by law, in an amount to be proven at trial.

86. Plaintiffs and class members also seek appropriate equitable relief, including an order requiring Defendant to adequately disclose and end its unfair, abusive, and deceptive trade practices.

87. Plaintiffs and the class also seek damages, attorneys' fees, costs, and any other just and proper relief available under the CPA. *Id.* § 13-408.

### COUNT III
### Violation of the Truth In Lending Act
### 15 U.S.C. §§ 1601, *et seq.*

88. This claim is brought individually and on behalf of the class.

89. Defendant is a "creditor," Plaintiffs' and the class's cash advances are "consumer credit transactions," and Plaintiffs, Defendant, and the class members are "persons" within the meaning of TILA. 15 U.S.C. §§ 1602(e), (f), (g), (i).

90. TILA required Defendant to disclose the: "amount financed"; "finance charge"; "annual percentage rate"; and "total of payments." *Id.* §§ 1638(a)(2), (3), (4), (5); *see also* Notice,

13

No.  CFPB-2024-0032,   https://files.consumerfinance.gov/f/documents/cfpb_paycheck-advance-marketplace_proposed-interpretive-rule_2024-07.pdf.

91. The purpose of these disclosure requirements is to ensure a meaningful disclosure of credit terms to protect consumers against unfair credit practices and to ensure consumers avoid the uninformed use of credit. *Id.* § 1601(a).

92. Defendant failed to disclose, among other things, the "amount financed," "finance charge," "annual percentage rate," "total of payments," and schedule of payments to Plaintiffs and the class members.

93. Indeed, at no time before, during, or after Plaintiffs or any class member obtained a loan or advance did Defendant disclose any of the above terms.

94. Because Defendant failed to comply with TILA's requirements, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1640(a).

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all claims so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

a. An order certifying the proposed class, appointing Plaintiffs as representatives of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b. An order awarding all damages available by law, with pre- and post-judgment interest;

c. An order requiring Defendant to repay all amounts associated with any advance that Defendant made to the class members within the past twelve years and on which Defendant charged, collected, contracted for, or received any tips, fees, or other amounts;

    d.       An order awarding attorneys' fees and costs;

    e.       An order declaring Defendant's conduct unlawful; and

    f.       An order awarding all other relief that is just, equitable, and appropriate.

                                              Respectfully submitted,

Dated: August 6, 2024                By:    */s/ Kevin Abramowicz*
                                                   Kevin Abramowicz
                                                   Kevin Tucker
                                                   Chandler Steiger
                                                   Stephanie Moore
                                                   Kayla Conahan
                                                   **East End Trial Group LLC**
                                                   6901 Lynn Way, Suite 215
                                                   Pittsburgh, PA 15208
                                                   Tel: (412) 223-5740
                                                   Fax: (412) 626-7101
                                                   kabramowicz@eastendtrialgroup.com
                                                   ktucker@eastendtrialgroup.com
                                                   csteiger@eastendtrialgroup.com
                                                   smoore@eastendtrialgroup.com
                                                   kconahan@eastendtrialgroup.com

                                                   Jason S. Rathod
                                                   Randy Chen
                                                   **Migliaccio & Rathod LLP**
                                                   412 H St NE
                                                   Washington, DC 20002
                                                   Tel: (202) 470-3520
                                                   jrathod@classlawdc.com
                                                   rchen@classlawdc.com

                                                   *Attorneys for Plaintiffs*